Filed 3/9/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MOISES FERNANDO DIAZ,<br><br>    Defendant and Appellant. | B307726<br><br>(Los Angeles County<br>Super. Ct. No. A042932) |


    APPEAL from an order of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.

    Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

    Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Steven D. Matthews, Supervising Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Moises Fernando Diaz appeals the trial court's July 16, 2020 order denying his motion to vacate his 1989 conviction by no contest plea to second degree robbery (Pen. Code, § 211)[1] pursuant to section 1473.7, subdivision (a)(1), on the basis that he did not understand the immigration consequences of the plea.  We affirm the trial court's order.

## FACTS AND PROCEDURAL HISTORY

### *The Robbery*[2]

On March 11, 1989, Diaz and two other men robbed the victim, who was working alone as a cashier at a Shell gasoline station.  The men lured the victim to the restroom where Diaz held a knife to his neck while the other men stole cash and items from the store.  Just after the robbery, Diaz was arrested nearby with a knife in his pocket that had blood on the tip.  The victim identified Diaz as the person who held a knife to his neck, and identified the knife as the weapon that Diaz held to his neck during the robbery.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The facts are derived from the victim's testimony at the preliminary hearing and police reports.

### *The Plea*

At the plea colloquy on May 22, 1989, defense counsel relayed to the court that Diaz had "two requests." First, Diaz wanted to counter the prosecution's offer of three years in prison, and "would be willing to plead to two years if he could get a forthwith [that day]." Second, if the counter-offer was not accepted, Diaz wanted to have bail reduced.

The trial court discussed the plea with Diaz and his counsel:

"The Court: . . . [W]e did discuss this matter and the District Attorney made an offer of mid term, plus one year, and I told you that if Mr. Diaz wanted to enter a plea today, based on the fact that he is only a little over 18 years old and has no serious adult record, I would sentence him to low term, plus the one year, which is three. [¶] That's bargain basement, Mr. Diaz. It isn't going to get any better. [¶] So if you don't want to take that, then, fine. We will just hold the matter on the trial calendar.

"The Defendant: What about half the time for the weapon, the commission of the crime, which will be six months?

"The Court: You got my bottom offer, Mr. Diaz. It is two plus one. It isn't going to get any better."

Diaz inquired regarding the number of custody credits he had accrued. He next asked the court if the $17 that he had in his wallet when he was arrested would be returned to him. The court discussed the matter of the procedure that must be followed to have the $17 returned to Diaz with counsel at length. Diaz stated, "Somebody got the money, and I want it. Simple as that."

The court returned to the question of Diaz's plea, and whether he wished to plead no contest for a total sentence of three years. Diaz stated, "I will take the three years, but I want it forthwith." The trial court informed Diaz it would sentence him that day, but that it would still take two to three weeks for Diaz to be moved to the Department of Corrections. Diaz conferred with his counsel sotto voice. He then responded that he did not want a "forthwith." Diaz said that he would "[t]ake care of that in two weeks. . . . [¶][¶] And I want a copy of the transcript."

The prosecutor next informed Diaz of his constitutional rights, which Diaz stated that he understood and wished to waive.

The prosecutor advised Diaz: "If you are not a citizen of the United States, your conviction in this case of this offense, which is a felony, could bring about your deportation or exclusion from the United States. You could be denied any right or privilege to enter this country lawfully or to become naturalized as a citizen. [¶] Of course, if you are now a citizen, this would not apply to you."

The prosecutor asked if Diaz had been provided adequate time to speak with his attorney, and Diaz stated that he had.

Diaz pleaded no contest to second degree robbery (§ 211), with personal use of a deadly weapon (§ 12022, subd. (d)). Diaz stipulated that the transcript of the preliminary hearing would serve as a factual basis for entry of the plea and admission of the enhancement.

Diaz was sentenced to three years in prison, consisting of the low term of two years for the robbery and one year for the personal use of a weapon enhancement.

### *Sentencing Hearing*

At the sentencing hearing on June 6, 1989, the trial court initially sentenced Diaz to the mid-term of three years, plus a stayed one-year term for the weapon use enhancement. Diaz conferred with his attorney sotto voice. Diaz's attorney then stated that Diaz's plea was for the low term of two years, plus one year for the weapon use enhancement. The trial court responded that it was happy to impose either sentence, but that Diaz was "going to do three years either way." Diaz stated that he wanted "it to be stated that it is the low term." The trial court set aside its prior pronouncement and resentenced Diaz as requested. The trial court stated that if Diaz wished to withdraw his plea, the court would permit him to do so, "[a]nd then if you are convicted, you can do six [years]." Diaz asked if the court could run the one-year sentence concurrently with the two-year sentence. The trial court responded, "no."

### *Motion to Withdraw the Plea*

On May 21, 2020, Diaz moved to withdraw his plea pursuant to section 1473.7, on the basis that he was not adequately advised of, and did not understand, the immigration consequences of his plea. The motion expressly did not allege ineffective assistance of counsel.

The motion averred that Diaz was a citizen of Mexico. He was brought to the United States by his mother in 1976, when he was six years old. He became a temporary resident of the United States on September 21, 1987, at the age of 16. At the time his plea was taken, Diaz was 18 years old and held a temporary

resident card. Diaz's temporary resident status expired on April 18, 1990, while he was in prison. Diaz had an appointment to obtain his "green card" (permanent resident status) scheduled at the time of the plea, but missed the appointment because he was incarcerated.

At the May 22, 1989 plea hearing, Diaz was represented by Deputy Public Defender Norman Katsuo Tanaka, who is now deceased. Diaz declared that Tanaka never discussed the potential immigration consequences of his plea with him or told him that he was pleading to an aggravated felony that would subject him to mandatory deportation, exclusion, and permanent ineligibility for citizenship. Tanaka did not ask where he was born or inquire regarding Diaz's immigration status. Diaz would not have knowingly accepted a plea that jeopardized his ability to legally remain in the United States with his mother.

Although he was advised that the plea could have adverse immigration consequences if he was not a citizen, Diaz did not believe that the consequences would apply to him because he was not an undocumented immigrant. He believed that the advisement only applied to people who were in the country illegally.

As a result of pleading no contest to the robbery, Diaz was classified as an "aggravated felon." Diaz's conviction of an aggravated felony rendered him permanently deportable, excludable, and ineligible for citizenship in the United States. When he was processed in prison, immigration officials advised him that although he had been convicted of a deportable offense, which also caused him to lose his temporary resident status, he would not be deported because he had been in the United States since childhood.

Diaz was not deported after he served his sentence, but was instead returned to the community. Diaz was convicted of misdemeanor driving under the influence (DUI) three times. In 1993, after he was arrested for driving under the influence a fourth time, he was convicted of felony DUI and sentenced to a term of 16 months in prison. Immigration officials advised Diaz that, although he could be deported on the basis of the robbery conviction or on the basis of the felony DUI conviction, he would not be deported because he came to the United States as a child. Diaz was released into the community after he served his sentence.

In 1995, Diaz moved to Oklahoma for a "fresh start." In Oklahoma, he was employed consistently and started a family.

In 2013, Diaz was deported on the basis of his robbery conviction, but he illegally re-entered the United States within six months to care for his mother, who was ill. Diaz's mother died on August 25, 2014. Diaz remained in the United States after his mother's death. He started his own business in Oklahoma and purchased multiple properties, which he managed.

On May 12, 2020, Diaz was taken into custody by agents of the Immigration and Customs Enforcement Agency in Oklahoma. At the time he filed the motion, Diaz was facing imminent deportation. However, if the trial court granted the motion and vacated Diaz's plea, his immigration attorney could file a motion to reconsider in immigration court seeking rescission of his 2013 Administrative Removal Order. If Diaz no longer had an aggravated felony on his record, his attorney would have a chance to argue for legal readmission before an immigration judge.

In the motion to vacate, Diaz argued that if either (1) his attorney had advised him that by making the plea, he would become an aggravated felon subject to mandatory devastating immigration consequences, or (2) he had understood that, as a temporary resident, he could be subject to these consequences, he would not have accepted the plea bargain. Instead, Diaz would have asked his attorney to seek conviction under a different charge with a sentence of 364 days in county jail, or to set the case for trial. He would not want to be separated from his mother and deported from the only country he ever knew.

Diaz agreed to immediately plead no contest to count 2, a violation of section 32,[3] if the District Attorney would stipulate to the court granting his motion to vacate the plea.

### Supplemental Brief in Support of the Motion to Vacate

On May 27, 2020, Diaz filed supplemental briefing in support of his motion to vacate. In the brief, Diaz first informed the court that he was in federal criminal custody for an alleged illegal re-entry, contrary to his previous statements. He argued that his motion was timely because the "clock on timeliness" did not begin to run until the amendments to section 1473.7 took effect on January 1, 2019.

---

[3] The information consists of a single count. No count 2 is listed.

***Second Supplemental Brief in Support of the Motion to Vacate***

On June 18, 2020, Diaz filed a second supplemental brief in support of his motion to vacate. Diaz reported that his new immigration attorney explained that robbery with a sentence of less than 5 years was not an aggravated felony when Diaz pleaded no contest to the crime in 1989. The brief specifically retracted all arguments made with respect to that issue. Instead, Diaz asserted he became immediately deportable at the time of his plea because robbery was a crime of moral turpitude. Diaz's new immigration attorney had explained to him that, if immigration officials informed him that he would not be deported when released after his 1989 and 1993 incarcerations because he had entered the country as a child, it would have been based solely on prosecutorial discretion. Diaz had no legal basis for remaining in the United States.

Diaz declared that Tanaka never asked about his immigration status and never informed him that he would be pleading to a crime of moral turpitude, which would lead to his deportation. He argued that an advisement that he could face adverse immigration consequences was insufficient because deportation was not merely a possibility; it was mandatory.

Diaz's attached declaration stated that Tanaka represented him in the robbery case, and did not ask about his immigration status. Tanaka did not inform Diaz that pleading guilty would make him ineligible to obtain permanent resident status. Tanaka did not inform him that robbery with a use of a knife allegation was a crime of moral turpitude that would render him deportable. If Diaz had known of the consequences, he "would

have pushed for a different charge, one that would not make me deportable."

### *Opposition to Motion to Vacate*

On July 13, 2020, the People filed an opposition to the motion to vacate. The People argued that (1) Diaz was not eligible for relief under section 1473.7 because he was in federal custody[4]; (2) the motion to vacate the plea was not timely filed[5]; (3) Diaz failed to demonstrate his attorney's alleged failure to advise him of the immigration consequences of the plea by a preponderance of the evidence; and (4) no prejudicial error took place during the plea proceedings that damaged Diaz's ability to meaningfully understand, defend against, or accept the immigration consequences of his plea.

### *The Trial Court's Ruling*

At a hearing on July 16, 2020, the trial court heard the motion to vacate the plea despite the fact that Diaz was in federal custody in the interest of fairness—whether the proper vehicle for vacating the plea was habeas corpus or a motion pursuant to

---

[4] The People do not make this argument on appeal. The Court of Appeal, First District, Division Two recently held, "the Legislature did not intend to bar persons from moving under section 1473.7 to vacate a conviction at a time when they are in custody for another, unrelated conviction." (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 315.)

[5] The People also do not argue that the motion was untimely on appeal.

section 1473.7, the court believed that the Legislature intended to provide an avenue for relief.

The trial court first found that Diaz's motion to withdraw his plea was timely because Diaz was living in Oklahoma when the California law took effect and may not have been aware that relief was available.

However, given the facts and the strength of the case against him, the trial court found it would be highly unlikely that Diaz would be charged with a lesser crime that did not have the same immigration consequences.

It was also unlikely that Tanaka would not have discussed the immigration consequences of Diaz's plea with him. The plea was taken two months after the arrest, which gave Tanaka ample time to review Diaz's case thoroughly. The probation and police reports would have alerted Tanaka to the fact that Diaz was born in Mexico and that it would be necessary to address the immigration consequences of the plea.

The trial court noted that Diaz was confrontational at the plea hearing, and appeared to have knowledge of the judicial system. Diaz was aware that his temporary status would be expiring in eight to ten months. The court would expect such a proactive defendant to ask about the immigration consequences of his plea.

The trial court stated that although Diaz had proven he was currently facing deportation, he had not shown whether he was facing deportation as a result of the 1989 robbery plea, rather than that the plea was just one factor among others. The crux of Diaz's problem appeared to be that he illegally entered the United States. Diaz had also suffered a felony DUI

conviction, a crime of moral turpitude that could be a possible basis for deportation.

Defense counsel responded that the plea could be viewed as the cause of the current deportation because if Diaz had not been deported based on his robbery conviction in 2013, he would not have re-entered the country illegally. With respect to the felony DUI conviction, felony DUI is a crime of moral turpitude for purposes of impeachment under state law, but not for immigration purposes under federal law.

The trial court ruled that Diaz failed to prove that his attorney did not adequately discuss the immigration consequences of his no contest plea with Diaz. The court found Diaz's declarations were self-serving. They appeared to be pattern declarations with wording that resembled the language in the motion. The court concluded that defense counsel remedied the problem to some extent by offering Diaz's hand-written declaration, but stated: "I'm just not putting a lot of weight on his declaration." The court noted that Diaz did not mention the DUI convictions he sustained in Oklahoma in the first declaration. The court stated, "I don't know if I'm getting a complete picture [from Diaz's declarations]." Moreover, Diaz's argument that his attorney could not have told him about the adverse immigration consequences of making the plea because if he had, Diaz would have sought a different resolution was "the circular argument of the end proves the hypothesis."

The trial court noted that there was a lack of evidence regarding Tanaka and what he knew and did, because he was deceased. Diaz did not prove his attorney's "pattern of practice" regarding immigration consequence advisement. The police report stated Diaz was from Mexico, so Tanaka should have been

12

alerted to possible immigration consequences, and likely would have addressed them with his client.

The trial court stated that, subsequent to making the plea, Diaz was advised of the potential immigration consequences of pleading no contest six times and took a plea each time. Diaz definitely would have become aware of the immigration consequences of his plea when he was deported in 2013. The court noted that, although it was not denying the motion for untimeliness, its analysis took into account that Diaz knew he was facing deportation, but took no steps to address the situation.

If the case had gone to trial, there would not have been a lesser included offense to robbery of which the jury could find Diaz guilty. The court could not "see any reasonable argument that he would have been able -- had he gone to trial, gotten a lesser or better deal, a lesser sentence, lesser charge, and given the amount of evidence against him, that he would have prevailed at trial. It just kind of goes into my factoring as to was it logical when he took the offer that he took. I think it was." The plea court had advised Diaz that he *could* face immigration consequences, and that is exactly what happened—Diaz remained in the United States for over 20 years before he was deported.

The court noted that Diaz was asking it to remove a strike offense from his record. Doing so would lead to the inequitable result that a defendant who was illegally in the country could have a strike erased while another defendant who was lawfully in the United States could not.

The court found that the evidence that Diaz would not have taken the plea was not "uncontroverted" as defense counsel asserted. Rather, there was a lack of evidence, as neither Tanaka

nor Diaz was available to testify in person.  The court was still charged with determining whether Diaz's declaration was credible.  The court explained that it gave the parties a detailed factual analysis at the hearing because it considered all of the factors it mentioned when evaluating Diaz's credibility—for example, that Diaz did not mention the Oklahoma DUIs initially, that he had been advised of immigration consequences six times after he pleaded no contest to burglary, and that he chose to re-enter the country illegally and break the law again.  Diaz did not seek any legal means of returning to the United States when he was deported in 2013.  The court did not find Diaz's claim that he was not advised of the immigration consequences of his plea credible.  For all of the reasons it discussed, the court denied Diaz's motion to vacate the plea.

## DISCUSSION

**Legal Principles**

As pertinent here, section 1473.7, subdivision (a), provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction or sentence . . . [¶] [if] the conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence [plea of guilty or nolo contendere].  A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel."[6]

---

[6] At the time Diaz moved to vacate his plea, section 1473.7, subdivision (a), provided that "[a] person who is no longer in

14

The defendant, as the moving party under the statute, has the burden to establish prejudicial error by a preponderance of the evidence.  (§ 1473.7, subd. (e)(1); *People v. Tapia* (2018) 26 Cal.App.5th 942, 949.)  "[R]eceipt of the standard statutory advisement that a criminal conviction 'may' have adverse immigration consequences (§ 1016.5), [does not] bar[] a noncitizen defendant from seeking to withdraw a guilty plea on that basis." (*People v. Patterson* (2017) 2 Cal.5th 885, 889.)

"[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.  When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances." (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).)  "'[I]n determining the credibility of a defendant's claim [of prejudice], the court in its discretion may consider factors presented to it by the parties, such as the presence or absence of other plea offers, the seriousness of the charges in relation to the plea bargain, the defendant's criminal record, the defendant's priorities in plea bargaining, the defendant's aversion to immigration consequences, and whether the defendant had reason to believe that the charges would allow an immigration-

criminal custody may file a motion to vacate a conviction or sentence . . . [¶] [if] the conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of *a plea of guilty or nolo contendere*." (Italics added.)  The amendment to the statute has no impact on the outcome of Diaz's case.

neutral bargain that a court would accept.' [Citations.]" (*People v. Bravo* (2021) 69 Cal.App.5th 1063, 1073–1074 (*Bravo*).) "'[A] defendant's self-serving statement—after trial, conviction, and sentence—that with competent advice he or she *would* have accepted [or rejected] a proffered plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice, and must be corroborated independently by objective evidence.' (*In re Alvernaz* (1992) 2 Cal.4th 924, 938; see *In re Hernandez* (2019) 33 Cal.App.5th 530, 547 ['"[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges *should instead look* to contemporaneous evidence to substantiate a defendant's expressed preferences." [Citation.]']; *People v. Mejia* (2019) 36 Cal.App.5th 859, 872 ['[i]n a postconviction setting, courts should not simply accept a defendant's statement of regret regarding the plea, courts should also "look to contemporaneous evidence to substantiate a defendant's expressed preferences." [Citation.]'].)" (*Bravo, supra*, at p. 1074.)

"[W]hen the moving party relies on a mistake of law under section 1473.7, subdivision (a)(1) that does not rise to the level of ineffective assistance of counsel" we independently review the trial court's ruling. (*Vivar, supra*, 11 Cal.5th at p. 526.) "'[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.] When courts engage in independent review, they should be mindful that '"[i]ndependent review is *not* the equivalent of de novo review . . . ."' [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. [Citations.] . . . [F]actual

determinations that are based on "'the credibility of witnesses the [superior court] heard and observed'" are entitled to particular deference, even though courts reviewing such claims generally may "'reach a different conclusion [from the trial court] on an independent examination of the evidence . . . even where the evidence is conflicting.'" [Citation.] . . . Where, as here, the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding. [Citation.] Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Id.* at pp. 527–528, fns. omitted.)

*Analysis*

We agree with the trial court's findings that Diaz's declarations were self-serving and not credible.

The evidence does not support Diaz's assertions that his attorney did not inquire about his immigration status or advise him of the adverse consequences of his plea, or that Diaz himself did not believe that the District Attorney's advisement applied to him.

Diaz knew he had temporary resident status that would soon expire and an upcoming appointment to obtain permanent resident status that he would necessarily miss if incarcerated. Although he was legally in the country at the time he pleaded no contest, he knew that he would lose his legal status if he made

17

the plea. Even if Diaz had believed that someone legally in the country would not face deportation or other immigration consequences as he claims, he also knew that his legal status would expire and that he would not have the ability to secure it. If he believed his fate relied on his legal status, he would have understood that if he made the plea he would not be in the country legally after his temporary resident status expired and that he would potentially be subject to adverse immigration consequences.

If Diaz's attorney had not spoken to him about immigration consequences prior to Diaz making the plea, it seems highly unlikely that Diaz would not have consulted him when Diaz was advised of the potential dangers by the District Attorney just prior to pleading no contest. Diaz was aggressive in his self-advocacy at the plea hearing. He asked multiple questions, spoke directly to the court several times, and attempted to bargain directly with the court as well. Diaz persevered in his efforts to obtain what he wanted, whether it was the significant benefit of a lesser sentence or the return of $17. It is simply not believable that he would leave his immigration status to chance without discussing it with his attorney. The more logical conclusion is that Diaz did, in fact, discuss deportation with Tanaka, knew it would be nearly impossible to avoid, and decided that the slim possibility of success at trial was not worth the risk that he would serve six years in prison.

Moreover, Diaz declared that he was processed by immigration officials prior to being imprisoned for his 1989 conviction, and that they informed him he had been convicted of a deportable offense and would lose his legal resident status (although he would not be deported despite his illegal status).

18

Diaz did not state that he was surprised, dismayed, or that he attempted to take any action to secure his legal status at that time. His inaction is inconsistent with his claim that he did not believe he would face any adverse immigration consequences and would not accept any resolution of the charges against him if he knew that he would not have a legal right to remain in the United States.

We further conclude that Diaz has failed to show he was prejudiced—i.e. that there was a reasonable probability Diaz would have rejected the plea agreement if he had correctly understood its actual or potential immigration consequences.

In addition to Diaz's declarations, there was contemporaneous objective evidence in his favor. Diaz had entered the country as a six-year-old child; deportation would have separated him from his mother and from the country where he had spent two-thirds of his young life. These are compelling reasons for Diaz to wish to remain in the United States legally.[7]

We cannot conclude that they are sufficient to meet his burden when weighed against other considerations, however. There is very strong evidence that Diaz made an informed decision to accept the plea bargain that he was offered. There was no other plea offer available to Diaz, as is evident from the plea colloquy and the sentencing hearing. The court stated that

---

[7] It is not known what ties Diaz had to Mexico at the time of his plea—whether Diaz spoke Spanish, had visited Mexico, or still had family and friends there who could have assisted him on his return. Diaz focuses on his current reasons for remaining in the United States, but most of these factors—family other than his mother, property, and employment, for example—were not considerations at the time of his plea.

the sentence it was willing to give Diaz was better than the one the District Attorney was willing to offer, and it was also the court's "bottom offer. . . . It isn't going to get any better." Given the facts of this case—including that Diaz was the only one of the perpetrators who wielded a deadly weapon, held a knife to the victim's neck, and drew blood—Diaz "'had [no] reason to believe that the charges would allow an immigration-neutral bargain that a court would accept.' [Citations.]" (*Bravo, supra,* 69 Cal.App.5th at pp. 1073–1074.)

The charges against Diaz were serious, and given his role in the robbery there was not a lesser charge that he could plead to. The benefit of the no contest plea was significant. If he went to trial and lost, he would face six years in prison—twice as much time as he served by pleading no contest.

Diaz's criminal history prior to the plea is largely unknown, but the record does not aid his cause. The plea court noted that Diaz stated that he was in juvenile hall the prior year, from which the court inferred he had sustained a prior juvenile petition. Additionally, at sentencing, the plea court stated, "Mr. Diaz, let me just add, that with your attitude, I hope that you live to serve out your three years. When you get up to prison, you are going to find out you are playing with the big boys." Diaz responded, "I have been there before." Diaz has not offered evidence that further supports or refutes that he had a prior criminal history.

Finally, Diaz's priorities in plea bargaining appear to have been singularly focused on reducing his sentence, with no reference to his immigration status, which would not have been preserved even if his attempts to bargain with the court had been successful. The factors that undermine his credibility, which we

20

discussed above, come into play here. Diaz asks this court to believe that his immigration status was of paramount importance, although he did nothing to discern his position or attempt to secure it. Diaz was advised that there could be immigration consequences if he was not a citizen of the United States. Diaz was *not* a citizen; he was a temporary permanent resident, and he *knew* he was a temporary permanent resident. Yet, knowing that he was not a citizen, Diaz asked neither the court nor counsel any questions about the potential consequences of his plea. These are not the actions of a person for whom legal immigration status is a priority. It is simply not believable that Diaz, who was belligerent and persistent in his pursuit of something as insignificant as the return of the $17 he had in his wallet when he was arrested, would not have asked any questions or sought a resolution that would preserve his immigration status if he believed that it was possible to do so. The circumstances indicate that this was very likely an unattainable goal, and that Diaz knew it was.

The record demonstrates that Diaz could not have bargained to maintain his legal status. The only way he could have hoped to remain in the country legally is to have taken the case to trial. The chance of his success, while not a consideration in and of itself, would necessarily have factored into his decision. That chance was slim. Diaz was positively identified by the victim as the man who held a knife to his neck, and he was arrested just after the robbery occurred with a bloody knife in his pocket, which was also identified by the victim as the weapon used. The possibility that Diaz was willing to elevate immigration consequences to paramount importance and risk trial by jury in the hope of an acquittal is exceedingly low. When

weighed against a sentence of six years in prison, it would be much more logical for Diaz to plead no contest to robbery and gain the greatest benefits available.  Diaz has not established that it is reasonably probable that he would not have pleaded no contest to robbery with use of a deadly weapon if he was certain that it was a deportable offense.

## DISPOSITION

We affirm the trial court's order denying Diaz's motion to vacate his robbery plea.


MOOR, J.


We concur:


RUBIN, P. J.


KIM, J.